IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Shane Brown, | : | |
| | : | No.: 2:20 cv 02087 DLR JZB |
| Plaintiff, | : | |
| vs. | : | |
| City of Phoenix, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiff's 1st Amended Complaint

Defendants' City of Phoenix and Pluta Answer

Defendant Cottrell's Answer

Defendants' Initial Disclosures & Exhibits

Plaintiff's Initial Disclosures & Exhibits

Plaintiff's Expert Disclosures

Phoenix Police Department Incident Report 201800001948788

Phoenix Police Department photographs

Deposition transcript of Shane Brown

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices and publications.  I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein.  I have considered various statements and accounts that may be in conflict one with another and considered factors such as the time at which the statement was made, the interests of the party making the statement, the vantage and view opportunities and perceptive abilities and consistency or inconsistency with the physical evidence, and evidence of any possible impaired cognition and the collective statements of other witnesses.  My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated synopsis of reported events:**

On September 2, 2018, at approximately 1922 hours, Shane Brown ("Plaintiff") was at the Quick Trip gas station and convenience store at 2725 West Peoria Avenue in Phoenix. Plaintiff took a six-pack of beer to the sales counter.  Plaintiff became agitated, apparently by something he thought that the clerk said to him.  Plaintiff began yelling at the clerk, slamming his hands on the counter.  The clerk, David Adams, grasped the six-pack of beer, intending to refuse to sell the beer to Plaintiff.  Plaintiff tried to grab it back.  Plaintiff and Adams struggled over the beer.  Plaintiff continued to yell at Adams as Plaintiff walked around the sales counter, moving to the side where the cash registers are located.  Adams told Plaintiff that he would call the police if Plaintiff did not leave.

Plaintiff went outside and continued to shout at Adams.  He banged on the windows of the store as he shouted.  Plaintiff testified: "I said, I'm going to kick your ass," referring to Adams.  Adams called the Phoenix Police Department.  The dispatcher broadcast a call for service, dispatching the incident as a commercial burglary in progress.

Phoenix Police Department Sergeant Jeffrey Pluta was working at a nearby Barnes and Noble bookstore.  Sergeant Pluta was wearing a Phoenix Police Department uniform with police badge and other police markings.  Sergeant Pluta heard the radio broadcast and stepped outside the bookstore.

Sergeant Pluta saw Plaintiff walking westbound toward a Jiffy Lube (located less than 200 feet across the street from the Quick Trip gas station and convenience store).  As Sergeant Pluta walked toward Plaintiff, Plaintiff ran between the Jiffy Lube and an adjacent Burger King restaurant.  Plaintiff ran in front of the Burger King, dropping his backpack, and into traffic on West Peoria Avenue, a busy four-lane divided road with center turn lanes.

Phoenix Police Department Officer Joel Cottrell was an on-duty officer assigned to respond to the report of the commercial burglary in progress.  As he approached the area in his marked Phoenix Police Department patrol car, he saw Plaintiff running through traffic on Peoria Avenue, causing drivers to take evasive maneuvers to avoid hitting Plaintiff.  Sergeant Pluta wove his way through traffic, following Plaintiff on foot.  Officer Cottrell turned on his emergency lights and siren and drove toward Plaintiff.  Officer Cottrell intercepted Plaintiff at the sidewalk in front of the Compass Bank at 2810 West Peoria Avenue.

Officer Cottrell twice commanded Plaintiff to get on the ground.  Plaintiff complied after the second command.  Officer Cottrell detained Plaintiff at gunpoint for a brief moment as Sergeant Pluta navigated across West Peoria Avenue and caught up to Plaintiff.

Officer Cottrell jumped over a low cinder block wall as Sergeant Pluta tried to handcuff Plaintiff.  Sergeant Pluta had seen that Plaintiff had some object under his shirt on the right side of his waist and he was concerned about Plaintiff reaching for the object.  As Sergeant Pluta placed his left knee on Plaintiff's waist area, he discerned that the object was hard and thought that it could be a weapon.  Sergeant Pluta told Officer Cottrell about what he observed.

Sergeant Pluta grasped Plaintiff's right wrist.  Plaintiff grabbed Sergeant Pluta's fingers and squeezed them.  Sergeant Pluta told Plaintiff to stop grabbing his hands and to relax. Plaintiff continued to yell and to move his hands while grabbing at Sergeant Pluta's hands, pants,

and shirt.[1]  Sergeant Pluta applied a wrist lock control hold on Plaintiff's right wrist and assisted Officer Cottrell with handcuffing Plaintiff.  Sergeant Pluta and Officer Cottrell rolled Plaintiff on his side and discovered that the hard object on Plaintiff's waist was large brass letter opener contained in a fanny pack.

When another officer arrived, the officers walked Plaintiff to Officer Cottrell's patrol car. Phoenix Police Department Officer Shawn Doucette brought Adams (the store clerk) to the scene.  Adams identified Plaintiff as the person who prompted his call to the police.  Officer Cottrell drove Plaintiff to the Cactus Park Precinct station to complete the pre-booking process.

At the Cactus Park Precinct station, Plaintiff told Officer Cottrell that he was in pain and he thought that his wrist and ribs were broken.  An officer called for the Glendale Fire Department paramedics to assess Plaintiff.  Plaintiff told the paramedics that he was all right and that the Sheriff's nurses could treat him.  Plaintiff had previously spent time in Maricopa County jail facilities and apparently had some knowledge of the jail medical procedures.  Glendale Fire Department paramedics told Officer Cottrell that Plaintiff's vital signs were good and that Plaintiff refused their assistance.

Due to Plaintiff's complaint of an injury, Officer Cottrell took Plaintiff to St. Joseph's Hospital to be medically evaluated.  Plaintiff told Officer Cottrell and hospital staff that he did not want to be assessed or treated.  Plaintiff was disruptive and uncooperative, and he cursed vulgarities at the nurses.  The hospital staff denied services and Plaintiff did not receive any medical treatment at St. Joseph's Hospital.

Officer Cottrell took Plaintiff to the Arizona Heart Hospital.  After some persuasion, Plaintiff agreed to be medically evaluated.  Medical staff identified broken ribs and a collapsed lung.  Plaintiff was treated.  Officer Cottrell told Plaintiff that he was no longer under arrest and left him at the hospital.  Plaintiff was subsequently charged with crimes related to the incident.

---

[1]  Plaintiff testified that Sergeant Pluta was considerably smaller than Plaintiff.  Plaintiff reported his weight at the time of the encounter as 200 pounds, and his height at 5'11" and described Sergeant Pluta as 5'10" and 160 pounds.

*Brown v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                   4

**Discussion and opinions:**

a.     **The officers correctly perceived that there was reasonable suspicion to detain Plaintiff and probable cause to arrest Plaintiff.**

1.     A reasonable and well-trained officer possessing the information gleaned by the brief initial information broadcast by the dispatcher, coupled with Plaintiff's flight, would quickly recognize that there was reasonable suspicion to detain and probable cause to arrest Plaintiff for violations of Arizona law.  Officers are taught in basic police academy training that probable cause is a flexible standard and that it is impossible to precisely define in the context of any single case.  They are taught that probable cause is more than mere conjecture or bare suspicion, but far less than proof beyond a reasonable doubt.  Officers are taught that the United States Supreme Court defines reasonable suspicion as "the sort of common-sense conclusion about human behavior upon which practical people are entitled to rely."[2]

2.     A reasonable and well-trained officer aware of the information known to or reasonably believed by the officers encountering Plaintiff would have concluded that there was reasonable suspicion to detain Plaintiff pursuant to an investigation of whether he committed commercial burglary and/or disorderly conduct.

3.     The Arizona disorderly conduct statute proscribes conduct including, but not limited to, "fighting, violent or seriously disruptive behavior; or . . . unreasonable noise; or . . . abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person, or [m]akes any protracted commotion, utterance or display with the intent to prevent the transaction of the business of a lawful meeting, gathering or procession."  Arizona Rev. Stat. § 13-2904.  Within the first few minutes of the officers' initial

---

[2]  This citation, from *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), is commonly presented in police basic training courses on Fourth Amendment principles.

fact-gathering Officer Cottrell became aware of actions by Plaintiff that constituted probable cause to believe that Plaintiff violated Arizona Rev. Stat. § 13-2904 by engaging in "violent or seriously disruptive behavior," making "unreasonable noise" while using "abusive or offensive language" against the store clerk at the Quick Trip store and intended to disturb the clerk's and store's peace and quiet.  Plaintiff testified that he shouted at Adams and threatened physical harm.  Plaintiff told Adams, "I'm going to kick your ass."  Based on the collective knowledge of Officers Cottrell and Doucette, and Sergeant Pluta there was reasonable suspicion to detain Plaintiff and probable cause to arrest Plaintiff for disorderly conduct.

4.    A reasonable and well-trained officer would quickly recognize that there was probable cause to arrest Plaintiff for committing commercial burglary.  Arizona law defines burglary in the third degree as "remaining unlawfully in or on a nonresidential structure or in a fenced commercial or residential yard with the intent to commit any theft or any felony therein."  Arizona Rev. Stat. § 13-1506(A)(1).  Officers Cottrell and Doucette learned from Adams that Plaintiff unlawfully moved from the front of the counter to behind the counter, in a space containing the cash register and commonly recognized as an area restricted to employees while he confronted Adams and forcibly tried to take the six-pack of beer.[3]  Based on the collective knowledge of Officers Cottrell and Doucette, and Sergeant Pluta there was reasonable suspicion to detain Plaintiff and probable cause to arrest Plaintiff for committing commercial burglary.

5.    A reasonable and well-trained officer would quickly recognize that there was probable cause to arrest Plaintiff for crossing a roadway at a point other than within a marked crosswalk.  The Arizona pedestrian crossing statute proscribes

---

[3]  Plaintiff acknowledged that he would be subject to a criminal charge by stepping back behind the counter, though he claims that he did not do so.

*Brown v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*                                    6

"crossing a roadway at any point other than within a marked crosswalk" unless the pedestrian "yield[s] the right-of-way to all vehicles on the roadway." Arizona Rev. Stat. § 28-793. Both Officer Cottrell and Sergeant Pluta personally witnessed Plaintiff run through busy traffic on a broad multilane roadway, not yielding to traffic and causing motorists to brake to avoid hitting Plaintiff.

6.     There is no evidence in the record provided to me that the officers had any knowledge or should have been aware that Plaintiff was then, or ever, "a qualified individual with the disability of bipolar." Plaintiff testified to his history of drug abuse and alcohol abuse. He was uncertain whether he had drank alcohol in the 12 hours before this incident, though he did not believe that he had. He testified that he "might" have taken his father's hydrocodone[4] within 24 hours prior to the incident. Plaintiff was confident in his testimony that he had snorted "crystal meth, yeah, speed" the day of the incident. Plaintiff testified that he has no recollection of telling any officer at the scene that he was bipolar or that he had any mental illness. Consistent with the officers' reports, Plaintiff denies any recall of talking to himself at any time during the encounter with the officers. Plaintiff's behavior in the very brief moments that the officers observed him before detaining and arresting him was consistent with that of a person who uses illegal drugs, such as crystal methamphetamine and/or opioids,[5] and who was running from the police because he did not want to get caught.

---

[4] Hydrocodone is a semi-synthetic opioid and is a restricted Schedule II narcotic under federal law, available only by prescription from a licensed professional. Possession of hydrocodone without a valid prescription for the person in possession is also a violation of Arizona law, Arizona Rev. Stat. § 13-3406.

[5] Officer Cottrell reported that Plaintiff's post-arrest behavior, observed much later at the second hospital visit, was "consistent with someone under the influence of drugs or possibly bipolar." Officer Cottrell reported that Plaintiff apologized for running from the officers. Plaintiff later denied apologizing. In the same course of events, Plaintiff told a female nurse that she was "ugly" and said to her: "I wouldn't even fuck you with that guy's dick" (referring to a male security guard present in the room).

7.      Police officers do not "charge" persons with crimes.  Rather, officers are responsible to gather evidence, including witness and victim statements, and present that evidence to prosecutors who are empowered to charge persons with violations of the criminal code.  Officers may recommend that particular charges be considered.  For example, Officer Cottrell recommended that Plaintiff "should be charged with A.R.S. § 13-1506(A)(1), committing commercial burglary in the third degree."  A reasonable and well-trained officer would report to a prosecutor those offenses for which there was probable cause to charge a person and for which the officer recommended charges.  Prosecutors are responsible to exercise their own judgment and professional discretion and to consider extrinsic factors, such as whether a person is on probation or parole and the offenses may be dealt with administratively, whether the evidence is sufficient to support conviction beyond a reasonable doubt (a standard far more rigid and demanding than probable cause), whether witnesses are available, whether some alternative non-prosecutorial resolution is available, and many other factors.[6]  Officers are trained to understand that whether the prosecutor agrees and files charges per the officer's recommendation, does not file charges, or files charges other than those recommended, it does not alter the officer's assessment of reasonable suspicion to detain a person and/or probable cause to arrest a person.[7]

---

[6]  National District Attorneys Association, National Prosecution Standards 3rd Edition, Standard 4-2.4, Charging Factors to Consider; American Bar Association, *Criminal Justice Standards for the Prosecution Function*, 4th Edition, Standard 3-4.4, Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges.

[7]  The record does not contain any court filings and it is not clear to me what charges, if any, resulted from this incident.  Whether charges were filed or not does not influence my opinions on whether the officers' decisions to detain and to arrest Plaintiff were consistent with the actions of reasonable and well-trained officers.

b.    **The force used to apprehend and control Plaintiff was consistent with generally accepted police training and practices.**

1.    The officers were responding to a report of a suspect believed to have committed a commercial burglary and reported to be agitated and aggressive. Plaintiff fled at the sight of Sergeant Pluta, running into a busy street.[8] The officers were obliged to apprehend Plaintiff and stop him from being a threat to the motorists, the general public, and himself. Officer Cottrell, not knowing whether Plaintiff was armed or not, properly drew his firearm and commanded Plaintiff to the ground.

2.    Sergeant Pluta had seen that Plaintiff had some object under his shirt on the right side of his waist. Sergeant Pluta was concerned that Plaintiff might have a weapon and knew that he should prevent Plaintiff from reaching for the object. As Sergeant Pluta placed his left knee on Plaintiff's waist area, he discerned that the object was hard and might well be a weapon. Sergeant Pluta used his left knee to pin Plaintiff to the ground and prevent him from reaching into his waist area. Holding a suspect in a prone restraint position by placing a knee on the suspect's back, buttocks, hips or legs, with the officer's other leg on the ground for stability, is a commonly taught technique.

3.    Sergeant Pluta used his right shin to hold Plaintiff's upper back to stabilize his position (allowing Sergeant Pluta the ability to refrain from placing his full body weight on Plaintiff's waist area) and effectively reach and control Plaintiff's right wrist in preparation for handcuffing. Sergeant Pluta then applied a wrist lock control hold on Plaintiff's right wrist and assisted Officer Cottrell with securing Plaintiff's hands in handcuffs.

4.    Securing Plaintiff's hands in handcuffs as quickly as reasonably possible was consistent with generally accepted police training and practices. One of the most

---

[8] Plaintiff testified that he ran at the sight of a uniformed person, but he did not recognize that it was a police officer.

*Brown v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*

fundamental practices taught to police officers is that arrested persons should be handcuffed in nearly all circumstances.  Handcuffing a person under arrest is something that officers are commonly taught as a reasonable safety precaution. Officers are taught that handcuffing prior to any transport to jail is an essential practice.  Handcuffing may prevent the necessity of using force on the arrested person and handcuffing helps protect the arrested person from self-harm.  A docile and cooperative arrested person may become aggressive, violent or attempt self-harm when the person recognizes that the arrest will lead to incarceration.  Thus, officers are taught, and most agencies require, that handcuffing is a necessary component of the arrest process, whether or not the arrest is for a traffic warrant or some more serious offense and whether or not the arrested person has been cooperative up to the point of handcuffing and transporting to jail.

5.   Plaintiff complains that Officer Cottrell did not intervene in Sergeant Pluta's efforts to control Plaintiff.  An officer has a duty to intervene and to take reasonable steps to protect a person from another officer's use of excessive force. Whether a duty to intervene is evident in a particular event must be considered in light of whether apparently unreasonable force was used and whether there was a realistic and reasonable opportunity to intervene.  The duration of the incident is a significant factor in assessing whether a reasonable opportunity to intervene existed.  Officer Cottrell observed the brief contact between Plaintiff and Sergeant Pluta.  Officer Cottrell did not see any unreasonable force used on Plaintiff.[9]

---

[9]  Plaintiff alleges that he was fully compliant with efforts to handcuff him and that Sergeant Pluta "jumped up and down" on Plaintiff's back "five to ten times" after he was handcuffed.  Plaintiff described something akin to a World Wrestling Entertainment Smackdown move, alleging that Sergeant Pluta jumped up on one foot and dropped down with a knee on Plaintiff's back.  Plaintiff made no report of injury or claim of unreasonable force to the paramedics, to officers that he later encountered at the precinct station, or to hospital staff when in the custody of the police.  If Plaintiff's claim is accurate, and not affected by mental illness or the drugs that he had used on the day of the incident, then Sergeant Pluta used a drop-knee television wrestling move that would not be consistent with police training.

Thus, there was no reasonable opportunity for Officer Cottrell to intervene in any other officer's use of force on Plaintiff. The force options used by Sergeant Pluta and Officer Cottrell were consistent with the actions of reasonable and well-trained officers and with generally accepted police training and practices.

6.     The hard object in Plaintiff's fanny pack was indeed a weapon. Earlier in the day, Plaintiff looked for a knife to carry with him. Unable to locate a knife, he took a large metal letter opener. Plaintiff knew that he would be in a high crime area. He testified that someone had pulled a gun on him on two prior occasions. Thus, he took the letter opener and intended to carry it as a weapon. Plaintiff said that this was the first occasion that he had carried the letter opener as a weapon and that he "just threw it in my bag" without a sheath or protective carrier. Plaintiff seemed to have been unaware of being stabbed by the unsheathed letter opener. He did not complain of any injury at the time of his arrest. Some time after his arrest, while at the Cactus Park Precinct station, Plaintiff complained of pain in his ribs but did not mention (possibly because he was unaware) any puncture wound. It appears that the letter opener may have penetrated his chest and punctured his lung, possibly at the time that Plaintiff "got down on the ground on [his] own accord" or possibly at some other time. The puncture was not discovered by paramedics or medical staff at St. Joseph's Hospital. No weapon or tactic used by the officers could have punctured Plaintiff's chest.

7.     Plaintiff also complains that the officers failed to employ de-escalation techniques to control his angry behavior. Though the record indicates otherwise, Plaintiff testified that he fully complied with the officers. De-escalation is not a single, magical technique or tactic; it is an end state that is dependent on a number of factors. Nor is de-escalation something that an officer does *to* a subject. De-escalation is sometimes defined as a result achieved by "the strategic slowing down of an incident in a manner that allows officers more time, distance, space

and tactical flexibility during dynamic situations on the street."  An officer may sometimes be successful in de-escalation by recognizing, creating and maintaining conditions that facilitate a subject in de-escalating his own emotions.  If the subject is unwilling or unable to engage with the officer in verbal de-escalation, the officer's efforts alone are very unlikely to result in the end product of de-escalation.

8.   One fundamental principle taught in de-escalation courses is that ensuring scene, subject and officer safety are essential conditions precedent to attempting to de-escalate a situation.  Another fundamental condition precedent to de-escalation attempts is the opportunity for the officer to engage in de-escalating contact with the subject.  There was no interstitial time between the point that Plaintiff was stopped while dodging traffic and securing Plaintiff that afforded a meaningful opportunity to attempt to de-escalate the situation.  Nor was this a situation that was escalating.  The officers detained, secured and arrested Plaintiff fairly expeditiously, even though Plaintiff was doing his best to escape.  Sergeant Pluta used de-escalation tactics in providing clear direction to Plaintiff to cooperate with handcuffing efforts.  Though Plaintiff declined to fully comply with Sergeant Pluta's directions, he was secured quickly and the struggle was very brief, obviating the need for further efforts to de-escalate Plaintiff's behavior.

2.   In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.   **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the

Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah. I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. After a period in private practice, I was as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs. I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for

several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.  I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses.  I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues.  I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.  I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies.  These policies serve as a model for all Utah public

safety agencies.  I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association.  I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color.  I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of  Officer-Involved Critical Incident Investigations Team IV.  I am Vice-Chair of the Salt Lake County Law Enforcement Administrators and Directors Association.  I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of

Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 3,300 public safety agencies in the United States.

10.      **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.  My other published works include:  *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police

Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff

(June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V.

81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*,

2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);

*Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J.

501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer,

September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers:*

*City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon*

*Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER:*

*The New TASER Aim Points,* Law Officer, January 2010.

11.     **My fee schedule is established as follows:** I charge $275.00 per hour for examination of

reports and documents, site visits, interviews, administrative tribunal, deposition or court

testimony, with a minimum of $1,100.00 for deposition or court testimony.  I bill for actual travel

expenses and a travel fee of $1,100.00 per day/part-day for travel to western states and $1,500.00

per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes**

**the following cases:**  I have been qualified as an expert in the subject matter of police

procedures, including use of TASER® devices, police use of force, shootings and wrongful death

claims, search and seizure, police service dog use, both in drug detection and dog bites, and I

have never had a court decline to find that I am a qualified expert witness.  I have testified and/or

provided depositions and trial testimony in the following cases which may be generally related to

the subject of the instant litigation in the past four years: *Gomez-Guerrero v. Villafuerte*, No. 20

L 70, 19th Judicial Circuit Court, Lake County, Illinois.  Deposition testimony given on behalf of

defendants.  Subject matter: wrongful death.  *Bueno v. Howard, et al.*, No. 2:16-cv-03450-

DGC-JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given

on behalf of defendants.  Subject matter: police use of force.  *Lane v. City of Mesa*, No.

2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition

testimony given on behalf of defendant.  Subject matter: wrongful death.  *Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.  *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police custody.  *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB, United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police custody.  *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT,United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.  *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019, Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Charboneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.  *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition

testimony given on behalf of defendants.  Subject matter: investigative procedures.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death. *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Trial testimony given on behalf of defendant.  Subject matter: negligence. *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police defensive deadly force.  *Johnson v. Peay*, No. 160700949, Second District Court, State of Utah, 2017.  Trial testimony given on behalf of defendant. Subject matter: police force to effect arrest.  *Brunette v. Burlington*, No. 2:15-cv-61, United States District Court for the District of Vermont, 2017.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Landon v. City of North Port*, No. 8:15-cv-02272-CEH-JSS, United States District Court for the Middle District of Florida, 2017. Deposition testimony given on behalf of defendant.  Subject matter: police force to effect arrest. *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016.  Trial testimony given on behalf of defendants.  Subject matter: police force to effect arrest.  *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of force.  *United States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of an electronic control device.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process.  They are based on the best information presently known to me.  I have

assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.


CONCLUSION

The officers correctly perceived that there was reasonable suspicion to detain Plaintiff and probable cause to arrest Plaintiff for several criminal offenses, including a traffic offense committed in the officers' presence, disorderly conduct and commercial burglary.  The force used to apprehend and control Plaintiff was consistent with generally accepted police training and practices and with the actions of reasonable and well-trained officers.


Kenneth R. Wallentine
May 23, 2021