UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
Shane Brown,                      )
                                  )
            Plaintiff,            )  No. 2:20CV02087
                                  )
vs.                               )
                                  )
City of Phoenix, et al.,          )
                                  )
            Defendants.           )
_____)
```

<u>VIDEOCONFERENCE DEPOSITION OF KENNETH R. WALLENTINE</u>

Via ZOOM
November 12, 2021
9:00 a.m.

*Miller Certified Reporting, LLC*
*Post Office Box 513*
*Litchfield Park, Arizona 85340*
*(P)623-975-7472 (F)623-975-7462*
*www.MillerCertifiedReporting.com*

(Copy)

Angela Furniss Miller, RPR, CR
Certified Reporter  (AZ50127)

1                          I N D E X

2      WITNESS                                      PAGE

3      KENNETH R. WALLENTINE

4           EXAMINATION BY MS. TATE                  4

5           EXAMINATION BY MS. ODEGARD              35

6           FURTHER EXAMINATION BY MS. TATE         36

7                           * * *

8                       E X H I B I T S

9
           (NOTE:  Exhibits 1 through 16 were marked in prior
10     depositions.)

11     NO.        DESCRIPTION                       PAGE

12     No. 1      Brown Video.MP4                    24

13     No. 4      Use of Force Report, Bates         30
                  DEFS.00073 - 00074
14
       No. 9      Phoenix Police Department Incident 32
15                Report dated 11/02/2021, Bates
                  DFS.00005 - 000013
16
       No. 15     Calls for service, Bates DEFS.1602 - 20
17                1604

18     No. 16     Report of Kenneth R. Wallentine    11

19                          * * *

20

21              QUESTIONS INSTRUCTED NOT TO ANSWER

22

23     QUESTION                            PAGE   LINE

24       (None.)

25

1          VIDEOCONFERENCE DEPOSITION OF KENNETH R.

2     WALLENTINE, a witness herein, was taken upon oral

3     examination by the parties through their respective

4     attorneys before Angela Furniss Miller, a Certified Reporter

5     in and for the County of Maricopa, State of Arizona, taken

6     on November 12, 2021, commencing at 9:00 a.m., via ZOOM.

7             Pursuant to Notice and Agreement by counsel that

8     said deposition may be conducted by means of ZOOM

9     videoconference, and pursuant to representations of the

10    deponent and as to location of the deponent in West Jordan,

11    Utah, during the course of said deposition and in reliance

12    upon said representations, Angela Furniss Miller, Certified

13    Reporter, administered the oath to the witness as required

14    by law.

15

16    COUNSEL APPEARING VIA VIDEOCONFERENCE:

17            LAW OFFICE OF ELIZABETH TATE
              BY:  Ms. Elizabeth D. Tate, Esq.
18            2953 North 48th Street
              Phoenix, Arizona  85018
19            attorneyelizabethtate@yahoo.com
              Attorney for Plaintiff
20
              HOLLOWAY ODEGARD & KELLY, PC
21            BY:  Ms. Sally A. Odegard, Esq.
              3020 East Camelback Road, Suite 201
22            Phoenix, Arizona  85016
              sodegard@hoklaw.com
23            Attorney for Defendants

24

25

```
 1                                         West Jordan, Utah
                                           November 12, 2021
 2                                         9:00 a.m.

 3                     KENNETH R. WALLENTINE,

 4      called as a witness herein, having been first duly sworn,

 5             was examined and testified as follows:

 6

 7                          EXAMINATION

 8      BY MS. TATE:

 9         Q.   Good morning, Chief Wallentine.  My name is

10      Elizabeth Tate and I represent the Plaintiff, Mr. Shane

11      Brown.

12             I understand you've given depositions many of

13      times; would that be correct?

14         A.   I've given --

15             MS. ODEGARD:  Object to form.

16             THE WITNESS:  I have given a number of depositions.

17      BY MS. TATE:

18         Q.   Okay.  And you've even testified in cases in

19      Arizona; would that be correct?

20         A.   Yes, I have.

21         Q.   And in your background you're trained as a lawyer?

22         A.   That's correct.

23         Q.   How long did you practice law, if you did?

24         A.   Well, I suppose that depends on what you mean by

25      "practice."  If you're talking about working full time as an
```

1      attorney, it's been 20 years or so.

2           Q.   Okay.  Are you licensed in Utah?

3           A.   Yes, I am.

4           Q.   Okay.  I notice that many of your cases are for the

5      defense.  Do you testify exclusively for the defense?

6           A.   I have in the past testified and worked on behalf

7      of Plaintiffs.  In my current employment, I am not permitted

8      to do so.  So presently I work only for firms or government

9      entities -- firms who represent government entities or for

10     the government entities themselves.

11          Q.   Okay.  Who determined what information you

12     considered for your report?

13          A.   I determined what information I considered among

14     the information sources that were available to me.

15          Q.   Okay.  Now, your report concluded that there was

16     probable cause to arrest Mr. Brown for disorderly conduct,

17     would you agree?

18          A.   Yes.

19          Q.   Hindering traffic, would you agree?

20          A.   I believe we talked about hindering traffic as

21     well, yes.

22          Q.   And then commercial burglary in the third degree?

23          A.   I don't know that I specified the degree; but yes,

24     we did talk about commercial burglary.

25          Q.   And you concluded that Sergeant Pluta and

1      Officer Cottrell used reasonable force against him and it

2      was within departmental policy?  You concluded that they

3      acted within departmental policy when they used force

4      against Mr. Brown?

5              MS. ODEGARD:  Form.

6              THE WITNESS:  I was really looking as to the

7      reasonableness of the force under constitutional standards

8      and generally accepted police practices and training.  I

9      don't believe that I opined specifically on the policies of

10     the Phoenix Police Department.

11     BY MS. TATE:

12        Q.   Okay.  And you would agree that the traffic offense

13     that Mr. Brown committed would not have been a serious

14     crime, would you agree?

15             MS. ODEGARD:  Form.

16             THE WITNESS:  Well, that's, you know, certainly a

17     gradient question.  The traffic offense can be more serious

18     or less serious depending on the conditions, the other

19     persons that are placed potentially in harm's way by the

20     commission of the offense.  There's a very significant

21     difference between certain traffic offenses committed at

22     3:00 a.m. when there is no other traffic, and the traffic

23     offense committed at -- at noon or 7 o'clock at night when

24     there is, in fact, traffic.

25             In terms of how it's -- the offense is categorized

1        in Arizona state law, I think one could say that it's

2        certainly not -- most traffic offenses and this one -- was

3        not a felony crime.

4        BY MS. TATE:

5           Q.   And would you agree that it's appropriate to use

6        less force against a suspect when the crime is not serious?

7               MS. ODEGARD:  Form.

8               THE WITNESS:  Certainly the severity of the crime

9        is one of those factors that an officer should consider when

10       making an arrest.

11       BY MS. TATE:

12          Q.   Now, you understand that Mr. Brown was accused of

13       going behind the counter at the QuikTrip and you understand

14       that there was a video concerning that; was that your

15       understanding?

16              MS. ODEGARD:  Form.  Foundation.

17              THE WITNESS:  That I -- I believe that he was

18       accused of going behind the counter.  I don't mean to

19       conclusively resolve any of the facts in this case, that's

20       not within my -- that's not within my scope of

21       responsibility here, so I think that the -- the statement of

22       the clerk -- and I've forgotten the clerk's name, but the

23       statement of the clerk at the QuikTrip convenience store and

24       the other evidence insofar as they're factual are what they

25       are.

1    BY MS. TATE:

2        Q.   But again, if he did not commit the burglary, that

3    would factor in the amount of force that Officers Cottrell

4    and Sergeant Pluta would have used against him?

5            MS. ODEGARD:  Form.

6            THE WITNESS:  Well, ultimately, I think -- again,

7    whether he committed the burglary or not is also not

8    something that I am I think qualified to opine on because I

9    think that's an issue for a trier of fact in the arena of

10   the Arizona criminal courts.  So whether he committed the

11   burglary as a matter of law and fact is not something that

12   the officers I think could have determined at that point

13   either.

14   BY MS. TATE:

15       Q.   But it was something to be considered when they

16   detained Mr. Brown with regard to the amount of force they

17   used on him?

18           MS. ODEGARD:  Form.

19           THE WITNESS:  They sure -- surely should have

20   considered the crimes that he was alleged to have committed

21   and the statement of persons providing information --

22   statements of persons providing information about the crimes

23   he had committed.

24   BY MS. TATE:

25       Q.   Now, your conclusion that the officers operated

1     within generally accepted police practices and training is

2     based on policies?

3              MS. ODEGARD:  Form.

4     BY MS. TATE:

5        Q.   What is that based on, your conclusion that

6     Mr. Brown's handling was consistent with generally accepted

7     police practices and training?

8              What does that mean?  What did you consider?

9              MS. ODEGARD:  Form.

10             THE WITNESS:  Well, I'll answer -- I'll answer your

11    first question.  I considered the generally accepted police

12    practices and training, as I understand them from

13    40-plus-now years of experience in the realm of public

14    safety, as someone who has been and continues to be a

15    trainer of law enforcement officers, including law

16    enforcement officers specifically in the context of making

17    arrests, detention, use of force and so forth; and consider

18    what the officers did and laid that alongside the ruler of

19    what we train police officers to do, what we understand from

20    courts and from statutes that is reasonable for the officers

21    to do, and concluded that the method of detaining Mr. Brown

22    and taking him into custody was consistent with those

23    practices and training that are known to police officers

24    throughout the nation and specifically in this case to

25    Phoenix police officers.

1    BY MS. TATE:

2       Q.   Did you review any of the Phoenix policies on

3    restraining suspects?

4            MS. ODEGARD:  Form.

5            THE WITNESS:  I don't recall -- I don't recall

6    whether I reviewed any of the -- the use of force policies

7    from the Phoenix Police Department in connection with this

8    case.

9            I think you're probably aware that I have worked in

10   other realms, other cases, involving the Phoenix Police

11   Department, and -- and have actually trained Phoenix police

12   officers, so I've had occasion on a number of times to -- to

13   review and to instruct on the use of force policies in

14   Phoenix -- in the Phoenix Police Department.

15           Whether I reviewed them for this case or not, I

16   don't recall.  I don't believe that I did.

17   BY MS. TATE:

18      Q.   Do you consider your report to be thorough?

19      A.   I consider my report to address those areas that I

20   was asked to opine on.  Again, I -- I hasten to add that

21   it's not my role here to establish matters of law or fact,

22   but only to give an opinion.

23      Q.   But looking at a policy wouldn't be a matter of law

24   or fact, it would be a matter of training, wouldn't it?

25           MS. ODEGARD:  Form.

1            THE WITNESS:  It may be.  It may be.

2   BY MS. TATE:

3       Q.   And I would like for you to take a look at your

4   report, did you bring it with?

5            MS. TATE:  It's our Exhibit No. 16, Angela.  If he

6   needs to see it --

7   BY MS. TATE:

8       Q.   Do you need to see it on the screen?

9       A.   No, I have a paper copy.

10      Q.   Okay.  That's fine.

11           Without belaboring the point, could you just let me

12   know whether or not you reviewed any policies specifically

13   on restraints that apply to police training in Phoenix?

14           MS. ODEGARD:  Form.  Are you asking him before he

15   authored his report?

16   BY MS. TATE:

17      Q.   Yeah.  When you authored your report, I want to

18   know if you looked at any policies from Phoenix regarding

19   restraining suspects.

20      A.   I have on a number of occasions, I can't tell you

21   last -- well, I can tell you the last time that I did that,

22   but beyond the last time that I did that, I can't tell you

23   about any points in time when I have.

24      Q.   Now, is there a policy on handcuffing suspects in

25   the prone position?

1          A.   I don't recall whether that's a matter of policy in

2     the City of Phoenix or not.

3          Q.   Is it a matter of training?

4          A.   Yes.

5          Q.   And how many techniques are there for detaining a

6     suspect in the prone position?

7               MS. ODEGARD:  Form.

8               THE WITNESS:  I'm not really quite sure what you

9     mean by that -- by that terminology, "how many techniques."

10               The application of handcuffing is very --

11     BY MS. TATE:

12          Q.   Let me change it.

13               MS. ODEGARD:  Elizabeth, will you let him please

14     finish his comment.

15     BY MS. TATE:

16          Q.   I'm sorry.  Go ahead.

17          A.   The application of handcuffing technique is going

18     to vary with a myriad of -- of factors, including the area,

19     the surface, the number of officers, the subject being

20     handcuffed, the subject's behaviors.  There's just many,

21     many variables, so I don't know that I can tell you that

22     there are X number of techniques.

23          Q.   Well, I think it was a question that needed to be

24     asked like this:  Are there certain knee-to-back maneuvers

25     that officers can use when detaining a suspect?

1          MS. ODEGARD:  Form.

2          THE WITNESS:  Yes, officers are taught that there

3     are circumstances in which they should use their shins and

4     knees to assist in detaining a suspect, and many times that

5     would be associated with the act of handcuffing.

6     BY MS. TATE:

7          Q.   Okay.  And in this case, do you know whether or not

8     Sergeant Pluta employed a knee-to-back maneuver to get

9     Mr. Brown into the handcuffs?

10         A.   Sergeant Pluta applied his knee to -- to help

11    secure Mr. Brown on the ground.  Insofar as that was part of

12    assisting Officer Cottrell in the handcuffing act, then I

13    suppose that you could fairly say that the placement of --

14    of pressure through the knee and the shin of Sergeant Pluta

15    was part of the handcuffing process.

16         Q.   And that pressure can be significant depending on

17    the size of Sergeant Pluta, correct?

18         MS. ODEGARD:  Form.  Foundation.

19         THE WITNESS:  Well, I'm not -- I'm not certain all

20    that you mean by significant.  Generally --

21    BY MS. TATE:

22         Q.   It was --

23         MS. ODEGARD:  Elizabeth, please let him finish his

24    answer.

25              ///

BY MS. TATE:

    Q.   I'm sorry.  I'm sorry.  I was going to ask another question.  You were unsure.

      Go ahead.

    A.   Generally the form is not something I would term as significant.  The force -- excuse me -- is not something I would term as significant, particularly whereas in this case it's a technique that's taught to use the knee and the shin and the officer is not resting his full body weight on someone's back and applying pressure, the full body weight through the -- the knee, that would not be -- that would not be what happened here.

    Q.   In fact, prone handcuffing can be dangerous, would you agree?

      MS. ODEGARD:  Form.

      THE WITNESS:  That's -- that's an incredibly broad question so I'll give you a correspondingly broad answer.

      Almost never, but I suppose that there are circumstances in which danger may arise during handcuffing, including during prone handcuffing.

BY MS. TATE:

    Q.   And, in fact, it can cause positional asphyxiation, can't it?

      MS. ODEGARD:  Form.

      ///

1    BY MS. TATE:

2        Q.   Positional asphyxiation?

3            MS. ODEGARD:  Form.  Foundation.

4            THE WITNESS:  There is a -- a very robust body of

5    work done primarily by people like Dr. Gary Vilke, Dr. Ted

6    Cham, Dr. Jeff Ho, a lot of it being done at the University

7    of California at Los Angeles Medical Center and some other

8    very prestigious medical schools that would reach exactly

9    the opposite conclusion, that positional asphyxia is a

10   phenomenon that is often misreported, errantly claimed and

11   unsupported by medical evidence.

12   BY MS. TATE:

13       Q.   That's one side of the spectrum, though; there is

14   another spectrum that says it's serious and it exists,

15   correct?

16           MS. ODEGARD:  Form.  Foundation.

17           THE WITNESS:  I am certain that in some cases where

18   a fatality has resulted from the application of arrest

19   techniques, that there may have been at some point someone

20   opining on the phenomena of positional asphyxiation and

21   attributing that as a contributing factor in the fatality.

22   That's certainly not the case here.

23   BY MS. TATE:

24       Q.   Well, did you look at Mr. Brown's injuries?

25       A.   I -- did I examine him?  No, I did not.  Did I look

1    at --

2        Q.   Did -- I'm sorry, go ahead.  Go ahead, I'm sorry.

3        A.   Did I look at the material available to me here

4    describing what happened?  Yes, I did, but I'm not -- I'm

5    not a physician or a surgeon so I certainly didn't evaluate

6    his injuries.

7        Q.   One of the things you had indicated that you

8    reviewed were the initial -- Plaintiff's initial disclosures

9    and exhibits.  In those initial disclosures and exhibits

10   there was a set of medical records, do you recall that?

11       A.   I do.

12       Q.   So, based on that review do you have an

13   understanding of what Mr. Brown's injuries were?

14       A.   I have a general understanding what his injuries

15   were.  Again, not being a medical practitioner, I'm not able

16   to describe those injuries in any degree of scientific

17   certainty.

18       Q.   Can you go ahead and tell me what your layman's

19   view is of the injuries?

20            MS. ODEGARD:  Form.  Foundation.

21            THE WITNESS:  If I recall correctly I believe that

22   there was a -- a penetrating injury.  I don't -- I don't

23   remember exactly where the entry wound was but there was a

24   collapsed lung that appeared to me, based on the records, to

25   have been associated with that penetrating injury, and that

1       Mr. Brown had one or more fractured ribs.

2       BY MS. TATE:

3           Q.   Now, in your report I didn't see where you talked

4       about the punctured lung or the fractured ribs in connection

5       with an application of excessive force.  Seems to me that

6       you looked at it in terms of:  Did the letter opener cause

7       his injury?

8               The question is simply this:  Is it relevant in

9       determining whether or not excessive force was used to

10      consider the injuries that the suspect sustained?

11              MS. ODEGARD:  Form.

12              THE WITNESS:  In analyzing the force and the result

13      of force in any detention or arrest, it is generally

14      relevant to examine the injuries that were sustained --

15      known to be sustained during the event.

16      BY MS. TATE:

17          Q.   Did you do that in your report?

18              MS. ODEGARD:  Form.

19              THE WITNESS:  I certainly, as is indicated in my

20      report, considered that there were certain injuries.

21      BY MS. TATE:

22          Q.   But you didn't consider whether or not they were

23      indicative of excessive force, did you?

24              MS. ODEGARD:  Form.

25              THE WITNESS:  I concluded that there was not

1     excessive force in this particular case.

2     BY MS. TATE:

3          Q.   But you didn't say that it wasn't excessive force

4     because of the injuries, correct?

5               MS. ODEGARD:  Form.

6               THE WITNESS:  I think -- I think you will not find

7     that line in my report.

8     BY MS. TATE:

9          Q.   And would that have been something that would be

10    helpful for a jury to know?

11              MS. ODEGARD:  Form.  Foundation.

12              THE WITNESS:  I think it would be helpful for a

13    jury to hear about the injuries from a medical practitioner

14    that can comment on the nature of the injuries and potential

15    vectors of infliction and the probable prognosis from the

16    injuries.

17    BY MS. TATE:

18         Q.   Okay.  But as an expert, would it be important for

19    you to opine whether or not a collapsed lung is or isn't an

20    indication of excessive force?

21              MS. ODEGARD:  Form.  Foundation.

22              THE WITNESS:  Generally it would not be.

23    BY MS. TATE:

24         Q.   And why do you say that?

25              MS. ODEGARD:  Form.

1          THE WITNESS:  Again, I'm -- not being a medical

2     practitioner, I don't know what the severity of a collapsed

3     lung is in relation to Mr. Brown.  I don't know when he got

4     the collapsed lung.  I don't have any certainty as to how

5     that occurred.

6          It's quite apparent that when he went to

7     St. Joseph's Hospital that he was very active and very

8     animated and was engaged in a type of dialogue with the

9     medical providers.

10          So I can -- I can tell you what his behavior was

11     like; what I'm not able to do -- again, I don't purport to

12     even be close to being able to do is to tell you what caused

13     that injury and how it impacted him, what the prognosis for

14     his recovery was.  I'm not able to tell you any of those

15     things.

16     BY MS. TATE:

17          Q.   You did read Mr. Brown's deposition, did you not?

18          A.   I did.

19          Q.   And you read the part where he said that

20     Sergeant Pluta was jumping up and down on his back?

21          A.   I did.

22          Q.   Okay.  And you're telling me that you're not

23     qualified to determine whether or not jumping up and down on

24     a back could cause an injury such as a collapsed lung?

25          MS. ODEGARD:  Form.  Foundation.

1          THE WITNESS:  Well, if you'd like me to give you a

2     medical opinion on that I can tell you that if in fact that

3     happened, and there's certainly no indication in the

4     evidence other than Mr. Brown's surgeon, but if in fact that

5     happened I think it's highly unlikely that there would be a

6     collapsed lung as a result of intermittent pressure applied

7     on Mr. Brown's back.

8     BY MS. TATE:

9          Q.   How long is pressure supposed to be applied when an

10    officer is using a knee-to-back technique to subdue a

11    suspect?

12             MS. ODEGARD:  Form.  Foundation.

13             THE WITNESS:  As long as there's a need for the

14    pressure to be applied.

15    BY MS. TATE:

16         Q.   Do you know how long it happened in this case?

17             MS. ODEGARD:  Form.

18             THE WITNESS:  I don't have a time measurement, no.

19    BY MS. TATE:

20         Q.   I want you to take a look at Exhibit No. 15.

21         A.   Can you tell me what that is?

22         Q.   It's a call-to-service report.

23         A.   All right.

24         Q.   And a call-to-service report was not considered by

25    you in your report, was it?

1        A.   I don't have that exhibit before me.  If you want

2    to provide it, I would be happy to look at it.

3        Q.   Yes.

4             MS. TATE:  Angela, could you put Exhibit 15 on the

5    screen.

6             THE COURT REPORTER:  One moment.

7             Okay.

8    BY MS. TATE:

9        Q.   Okay.  Looking at this call-to-service complaint,

10   it indicates that there was a -- there was an

11   Officer Lyndsey who was on video monitoring.  Have you seen

12   one of these before?

13            MS. ODEGARD:  Object to form.

14            THE WITNESS:  I have.

15   BY MS. TATE:

16       Q.   Okay.  And I want to scroll down to the second page

17   and get to the part where it says in the middle of the page:

18   "Running towards Peoria.  NB on Peoria -- Peoria towards

19   bank."

20            And then it says:  "19:24:34 seconds, A23 proned

21   out on curb, NSS officer making contact."

22            And then it says:  "Complainant can't see subject

23   from camera anymore, SEES, PD, EOC"; and then the next line

24   is:  "Taking into custody at 19:24:40 seconds --

25   47 seconds."

1          So when I look at that, that lets me know that it

2     took anywhere from 20 to 30 seconds for Officer Pluta and

3     Cottrell to take Mr. Brown into custody.

4          MS. ODEGARD:  Form.

5     BY MS. TATE:

6          Q.  Did you make that conclusion?

7          MS. ODEGARD:  Form.  Foundation.

8          And Elizabeth, if you're going to ask him questions

9     about this document, could you give him a chance to read

10    through it, please.

11    BY MS. TATE:

12         Q.  Sure.  Let's stop for a second and you can read

13    through the whole thing, Chief Wellington.

14         MS. TATE:  You want to give him control of the

15    screen, Angela?

16         THE WITNESS:  No, I can -- I can expand it out

17    myself on my screen.

18    BY MS. TATE:

19         Q.  Okay.

20         A.  So you were looking at the time of 19:24:34,

21    correct?

22         Q.  Right.

23         A.  And which other entry were you looking at?

24         Q.  19:24:47, taking into custody.

25         A.  Well, I certainly will confirm that that is a

1       period of 13 seconds.  What that 13 seconds represents, I

2       don't know.  Really, what you're talking about here is a

3       dispatch log.  So somebody is entering those times based on

4       either extrinsic evidence -- somebody can see the events

5       happening -- or someone is broadcasting particular events

6       onto the radio and the dispatcher is then typing that

7       information into this particular form.

8              But I do agree that there is a 13-second

9       interstitial period between those two entries.

10      Q.   So if Mr. Brown testified that during that time

11      pressure was being applied to his back, that would mean that

12      there would be 13 seconds of -- of time where the pressure

13      was applied, according to Mr. Brown?

14             MS. ODEGARD:  Form.  Foundation.

15             THE WITNESS:  If Mr. Brown looked at these two

16      entries and correctly performed the math, and if he

17      testified that those two entries represent the initiation

18      and the cessation of pressure on his back, then in fact

19      Mr. Brown effectively would be testifying to a 13-second

20      period.

21      BY MS. TATE:

22      Q.   Did you take a look at any videos concerning this

23      incident?

24      A.   I did.  I don't recall what they were labeled and

25      they're in -- they were in some of the disclosures as

1        exhibits, but I don't recall what they were labeled.

2            Q.   Did you consider the amount of pain Mr. Brown

3        experienced to determine if excessive force had occurred?

4                MS. ODEGARD:   Form.   Foundation.

5                THE WITNESS:   I -- you know, I am -- as I

6        mentioned, I'm not a physician, I'm not competent to apply

7        pain metrics.   I do have six physicians in my immediate

8        family, so I am -- I am familiar with particular types of

9        pain scales that physicians and surgeons use, but I didn't

10       see any evidence of a reliable pain metric in the record so

11       I can't tell you that I considered anything like that.

12       BY MS. TATE:

13           Q.   Would you take a look at the video.

14               MS. TATE:   And we're going to play video 1, please,

15       Angela.

16               THE COURT REPORTER:   One moment.

17               THE WITNESS:   If you play the video I will be able

18       to tell you whether I looked at that particular video or

19       not.

20       BY MS. TATE:

21           Q.   Yes, it's a video of the arrest, so you can let me

22       know if you saw it; and if you didn't see it, we'll review

23       it now and I want to ask you some questions about it.

24           A.   I am unable to say whether the video that you will

25       show me in the future here is a video that I have viewed in

1      the past.

2          Q.   Okay.  That being said, I still want to have you

3      view the video.

4              MS. ODEGARD:  Just for the record.  Just for the

5      record, this is the only body cam footage that's -- relates

6      in any way to this detention of Mr. Brown, so I'll just

7      represent, Chief, that this is the only body cam footage

8      that exists and we've provided to you.

9              THE WITNESS:  I -- I will assume that I've seen it;

10     but, you know, I -- to both of you, I don't want to tell you

11     that I've seen it until I see it here today to make sure

12     that we're both talking about the same video recording.

13     BY MS. TATE:

14         Q.   Okay.  Let's take a break and get the video going.

15             THE COURT REPORTER:  One moment.

16             Please let me know -- there's no sound right now,

17     however.

18             THE WITNESS:  I don't think any sound kicks in

19     until about the first 30 seconds.

20             (Video played.)

21

22             MS. TATE:  Okay, I think we can stop the video now

23     and ask a few questions.

24     BY MS. TATE:

25         Q.   Now, Chief Wellington, did you hear Mr. Brown

1       screaming "ow"?

2           A.   I did.

3           Q.   And did you consider Mr. Brown screaming in pain in

4       your assessment of whether or not excessive force was used

5       against him?

6               MS. ODEGARD:  Form.  Foundation.

7               THE WITNESS:  I was certainly aware and considered

8       it, yes.

9       BY MS. TATE:

10          Q.   Is it in your report?

11              MS. ODEGARD:  Form.

12              THE WITNESS:  I don't think I listed in my report

13      what I heard.

14      BY MS. TATE:

15          Q.   Would that have been important to put that in your

16      report if you thought it played a role in the excessive

17      force?

18              MS. ODEGARD:  Form.  Foundation.

19              THE WITNESS:  If there was a statement or a sound

20      that I thought was important in assessing the reasonableness

21      of force, I would have included it in my report.

22      BY MS. TATE:

23          Q.   Now, Mr. Brown claims that Sergeant Pluta was

24      trying to break his fingers.  Did you read that in his

25      deposition?

1          MS. ODEGARD:  Form.

2          THE WITNESS:  Yes, I -- yes, I did.

3     BY MS. TATE:

4          Q.   Okay.  And you also heard that -- the screaming of

5     Mr. Brown as he was going to the squad car and

6     Sergeant Pluta was saying:  "You're trying to break my

7     fingers."  Do you remember that part?

8          MS. ODEGARD:  Form.

9          THE WITNESS:  I do.

10    BY MS. TATE:

11         Q.   Now, neither of the officers claimed that Mr. Brown

12    was making furtive movements, correct?

13         MS. ODEGARD:  Form.

14         THE WITNESS:  I don't think the reports make any

15    reference to that, to furtiveness.

16    BY MS. TATE:

17         Q.   Okay.  And as a matter of fact they claimed they

18    were having trouble controlling Mr. Brown?

19         MS. ODEGARD:  Form.

20         THE WITNESS:  That's correct.

21    BY MS. TATE:

22         Q.   And if they were having trouble controlling

23    Mr. Brown, could they have gained control by drawing the

24    weapon again?

25         MS. ODEGARD:  Form.  Foundation.

1          THE WITNESS:  Well, hypothetically I think the

2    answer is yes, although that's dependent on Mr. Brown's

3    perception of a weapon and perception of the nature of the

4    display of a weapon and his volitional choice on how he

5    would respond to seeing a weapon.

6    BY MS. TATE:

7        Q.   Well, Officer Cottrell's report and Mr. Brown

8    testified that when he saw the gun, he got down, gave up.

9    Do you recall reading that?

10          MS. ODEGARD:  Form.

11          THE WITNESS:  I don't know those exact words.  I do

12   recall Mr. Brown complied after a couple of repeated

13   commands.  What -- what prompted him to do that, I don't

14   know.

15   BY MS. TATE:

16       Q.   But Office Cottrell did draw a weapon on him,

17   correct?

18       A.   At one point Officer Cottrell displayed a weapon.

19       Q.   And hypothetically speaking, he could have

20   displayed a weapon again?

21          MS. ODEGARD:  Form.

22          THE WITNESS:  I agree with your hypothesis.

23   BY MS. TATE:

24       Q.   And neither of the officers warned Mr. Brown that

25   they were going to use force, did they?

```
 1              MS. ODEGARD:  Form.

 2              THE WITNESS:  They gave -- they gave him commands

 3     that I believe a reasonable person would interpret as

 4     understanding that if the person did not comply that they

 5     would be forced to comply.

 6     BY MS. TATE:

 7        Q.   Policy said that you have to give warnings, though,

 8     don't they?

 9              MS. ODEGARD:  Form.

10              THE WITNESS:  Again, they gave him commands which a

11     reasonable person I think would interpret as a warning that

12     force would be used if a person chose not to comply with the

13     commands.

14     BY MS. TATE:

15        Q.   And a reasonable person could also understand that

16     that force would be used if it were said:  "I'm going to use

17     force."  That that also would allow a reasonable person to

18     determine whether or not force would be used, correct?

19              MS. ODEGARD:  Form.  Foundation.

20              THE WITNESS:  Again, I agree with that hypothesis

21     as well.

22     BY MS. TATE:

23        Q.   Did you notice if there was a use of force report

24     that had been filled out by Sergeant Pluta?

25        A.   I'm sorry.  Would you --
```

```
1              MS. ODEGARD:  Form.
2              THE WITNESS:  I didn't catch the first part of your
3      question.
4      BY MS. TATE:
5         Q.   Sure.  Did you notice in the materials that you
6      reviewed that a use of force report had been filled out by
7      Sergeant Pluta?
8              MS. ODEGARD:  Form.
9              THE WITNESS:  I -- I don't recall who completed the
10     use of force report.
11             MS. TATE:  Could we take a look at Exhibit No. 4,
12     Angela.
13     BY MS. TATE:
14        Q.   If you could, Chief Wallentine, could you review
15     that -- read that real quick?
16        A.   It's not very clear on my screen, but I've seen
17     this form before.
18        Q.   When is the form used by the Phoenix Police
19     Department?
20             MS. ODEGARD:  Form.
21             THE WITNESS:  Generally the form is used when a
22     supervisor directs it to be used or the circumstances arise
23     that the form should be used.  That's usually in a
24     use-of-force situation.
25                  ///
```

1    BY MS. TATE:

2       Q.   So if there's a use-of-force situation with

3    Mr. Brown, it's fair to assume that that's why the report

4    was written?

5            MS. ODEGARD:  Form.

6            THE WITNESS:  I believe so.

7    BY MS. TATE:

8       Q.   And in it it says that soft, empty hands techniques

9    were used at the bottom of the page.  Could you tell me what

10   a "soft, empty hand technique" is?

11      A.   Sure.  That -- that term can refer to a number of

12   control holds, locks, techniques to gain compliance; as

13   opposed to when one speaks of "hard hands," one is referring

14   to closed fists and typically certain types of strikes.

15           A shove can also be an empty hand technique;

16   there -- there are a number of them.

17      Q.   Do you know which one was used in this case?

18      A.   Based on what I reviewed, I believe that there was

19   a twist lock with an effort to place Mr. Brown into

20   handcuffs.

21      Q.   Now, your report doesn't mention Mr. Brown's mental

22   illness as a factor in his arrest, would you agree?

23           MS. ODEGARD:  Form.

24           THE WITNESS:  Again, I don't think you'll find that

25   mentioned in my report as a factor of his arrest -- in his

1    arrest.

2    BY MS. TATE:

3        Q.   Do you have any training on how the ADA applies to

4    arrests?

5        A.   I do.

6        Q.   And with regard to that, when the police arrest a

7    mentally ill suspect, it would be appropriate to find an

8    appropriate adult to assist that suspect, wouldn't it, under

9    the ADA?

10            MS. ODEGARD:   Form.   Foundation.

11            THE WITNESS:   Well, I've had a fair bit of training

12   about the ADA and litigated cases involving the ADA, I can't

13   think of a single provision of the Americans with

14   Disabilities Act that would apply to the circumstance that

15   you mention; and the -- the hypothesis is somewhat weak in

16   that it is generally nearly always unknown to the officers

17   whether there has been a diagnosed mental illness for that

18   particular person and whether the person is experiencing the

19   effects of that mental illness at the point of an arrest.

20            Arrests tend not to be scheduled events with the

21   facts laid out beforehand.

22   BY MS. TATE:

23       Q.   In Exhibit 9, which is Officer Cottrell's report,

24   he states that Mr. Brown may have had bipolar.   Do you see

25   that?

1          A.   I don't recall -- I know that somewhere in the

2     reports there is a discussion that Mr. Brown may have had

3     some mental illness; where it appears in the -- in the DR,

4     the incident report, I don't recall.

5          Q.   Have you ever seen a situation where the police

6     department finds an appropriate adult to assist a mentally

7     ill suspect?

8               MS. ODEGARD:  Form.

9               THE WITNESS:  I have seen circumstances in which

10     police have been called to deal with persons experiencing an

11     apparent mental illness and there is a mobile crisis

12     outreach team or a -- the designated social worker,

13     occasionally psychiatric emergency technician, that are

14     called to the scene or sometimes may be present at the

15     scene.

16     BY MS. TATE:

17          Q.   And mental illness is a factor to be considered in

18     use of force, would you agree?

19               MS. ODEGARD:  Form.

20               THE WITNESS:  I would agree that when officers are

21     aware that a person is mentally ill and aware that persons

22     experiencing the impact of that mental illness at a

23     particular point in time that may coincide with an arrest,

24     that that is something that the officers should consider.

25               ///

1    BY MS. TATE:

2        Q.   Okay.  Let me take a quick break.  I'm going to go

3    back and we'll finish up.  Just give me five minutes.

4                 MS. ODEGARD:  Okay.

5                 (Recess taken from 9:53 a.m. to 9:56 a.m.)

6

7    BY MS. TATE:

8        Q.   Officer Cottrell puts in his report that he

9    released Mr. Brown at the hospital without any charges.  Do

10   you have any understanding as to why Mr. Brown was released

11   without charges?

12       A.   I don't have any certain knowledge of that, no.

13       Q.   And you would agree, though, that Mr. Cottrell --

14   that Officer Cottrell didn't call any family member to

15   assist Mr. Brown, correct?

16                MS. ODEGARD:  Form.  Foundation.

17                THE WITNESS:  I don't know that to be the case.

18   BY MS. TATE:

19       Q.   And you didn't consider the 13 seconds in your

20   determination -- strike that.

21            You didn't consider the 13 seconds of interaction

22   that Mr. Brown had with the officers as being excessive?

23   Did you consider that?

24                MS. ODEGARD:  Form.

25                THE WITNESS:  I don't know what that 13-second

1    period actually represents.  So it would be fair for me to

2    agree with you that I did not consider a 13-second period at

3    the points that you marked, that would be fair.

4        MS. TATE:  Okay.  Pass the witness.

5        MS. ODEGARD:  Chief, just a couple of quick

6    questions.

7

8                        EXAMINATION

9    BY MS. ODEGARD:

10       Q.   You were asked about the use of force operations,

11   orders and policies for the City of Phoenix.  Do you

12   remember those questions?

13       A.   I do.

14       Q.   And if I understood your testimony correct, you

15   were familiar with the operations, policies and procedures

16   of the City of Phoenix in effect at the time of this

17   incident based on your prior experience and even your

18   experience in training Phoenix police officers; would that

19   be fair?

20       A.   That is correct.

21       Q.   And you have also been provided with the complete

22   copy of those use of force operations orders in this case

23   that were in effect at the time; is that right?

24       A.   I had a copy already; I have another copy.

25       Q.   Okay.

1      A.   I have recently reviewed those policies, they

2  haven't changed.

3      Q.   Okay.

4      A.   And I am familiar with those operational orders.

5  What I -- I hope I didn't speak inartfully.  What I meant to

6  say is, I see those on a relatively frequent basis.

7      Q.   And you were familiar with those and had the

8  benefit of that information at the time of the preparation

9  of your report?

10     A.   I -- I did.  I wrote this report in May I think

11  of -- of this year and had done a fairly thorough review in

12  early May of that operational order family.

13     Q.   Okay.

14         MS. ODEGARD:  Thank you, Chief.  I just wanted to

15  make the record clear.

16         No further questions.

17         MS. TATE:  I have a couple of questions.

18

19                     FURTHER EXAMINATION

20  BY MS. TATE:

21     Q.   The policy did change with regard to neck-to-knee

22  detentions, correct?

23         MS. ODEGARD:  Form.  Foundation.

24         THE WITNESS:  The policy with -- with respect to

25  neck-to-knee, yes, but this is not a neck-to-knee case.

1      BY MS. TATE:

2         Q.   Do you know when that policy changed?

3           MS. ODEGARD:  Form.

4           THE WITNESS:  Oh, I remember the announcement but I

5      don't -- I don't remember the date.

6      BY MS. TATE:

7         Q.   And you don't have any recollection of whether or

8      not there is a policy on prone handcuffing?

9           MS. ODEGARD:  Form.

10          THE WITNESS:  I know that handcuffing while prone

11     is permitted; I don't know -- I don't recall the language of

12     the handcuffing policy and -- and whether it talks about

13     prone techniques in the policy or whether that's left to --

14     only to the training with respect to handcuffing.

15     BY MS. TATE:

16        Q.   And in your report you didn't have any analysis of

17     the prone handcuffing, did you?

18          MS. ODEGARD:  Form.

19          THE WITNESS:  I don't have an extensive discussion

20     in my report about prone handcuffing techniques; that is

21     correct.

22     BY MS. TATE:

23        Q.   And in this case, prone handcuffing technique was

24     employed?

25        A.   Mr. Brown was, in fact, handcuffed in a prone

1    position.

2              MS. TATE:  Nothing further.

3              THE WITNESS:  So before we go off the record, if

4    you could let me know, Ms. Tate, where you would like me to

5    send the statement and the tax form for the deposition time.

6              MS. TATE:  Okay.  You want to -- let's do it off

7    the record.

8              THE WITNESS:  Okay.

9              MS. TATE:  Let's do it off the record.

10             THE WITNESS:  All right.

11             (The deposition concluded at 10:00 a.m.)

12

13                            ---oOo---

14

15             I, the undersigned, say that I have read the

16   foregoing transcript of testimony taken November 12, 2021,

17   and I declare, under penalty of perjury, that the foregoing

18   is a true and correct transcript of my testimony contained

19   therein.

20             EXECUTED this _____ day of

21   _____, 2021.

22

23

24

25             _____
               KENNETH R. WALLENTINE

1                    C E R T I F I C A T E

2    STATE OF ARIZONA    )
                         )  ss.
3    COUNTY OF MARICOPA )

4

5            BE IT KNOWN that the foregoing proceedings were
     taken before me, Angela Furniss Miller, Certified Reporter
6    No. 50127, that the witness before testifying was duly sworn
     by me to testify to the whole truth; that the total 39 pages
7    are a full, true, and accurate record of the proceedings,
     all done to the best of my skill and ability; that the
8    proceedings were taken down by me in shorthand and
     thereafter reduced to print under my direction.

9

              [X] Review and signature was requested.
10            [ ] Review and signature was waived.
              [ ] Review and signature was not requested.

11

              I CERTIFY that I am in no way related to any of the
12   parties hereto nor am I in any way interested in the outcome
     thereof.

13

14            I FURTHER CERTIFY that I have complied with the
     requirements set forth in ACJA 7-206.  Dated at LITCHFIELD
15   PARK, Arizona, this 28th of November, 2021.

16            _____
17                 Angela Furniss Miller, RPR, CR
                   CERTIFIED REPORTER (AZ50127)

18

19                    *       *       *

20

              I CERTIFY that Miller Certified Reporting, LLC, has
21   complied with the requirements set forth in ACJA 7-201 and
     7-206.  Dated at LITCHFIELD PARK, Arizona, this 28th of
22   November, 2021.

23            _____
24                 Miller Certified Reporting, LLC
                   Arizona RRF No. R1058

25